# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| HENRY T. WITTENBERG, D.O., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| OKLAHOMA HEALTH CARE | ) | |
| AUTHORITY, MICHAEL FOGARTY, in his | ) | |
| official capacity as the Chief Executive Officer | ) | |
| of the Oklahoma Health Care Authority, | ) | |
| NICO GOMEZ, in his official capacity as the | ) | Case No. 10-CV-0238-CVE-TLW |
| State Medicaid Director, LYNN MITCHELL, | ) | |
| M.D., in his official capacity as the State | ) | |
| Medical Director, INNOVATIVE RESOURCE | ) | |
| GROUP, LLC, d/b/a APS Healthcare Midwest, | ) | |
| a/k/a APS, a/k/a APS Healthcare, THOMAS | ) | |
| CONIGLIONE, individually and in his official | ) | |
| capacity as the retrospective review coordinator | ) | |
| of APS, and DANIEL SORRELLS, individually | ) | |
| and in his official capacity as the executive | ) | |
| director of APS, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court is Defendants Innovative Resource Group, LLC, Thomas Coniglione, and Richard Sorrells Motion to Dismiss and Brief in Support (Dkt. # 17). Defendants Innovative Resource Group, LLC (APS), Thomas Coniglione, and Daniel Sorrells[1] (collectively, APS Defendants) seek to dismiss plaintiff Henry T. Wittenberg, D.O.'s claims against them for violations of 42 U.S.C. § 1983 and tortious interference with contract.

---

[1]     The motion to dismiss states Sorrells's name as "Richard Sorrells." Dkt. # 17, at 1. However, counsel for Sorrells filed a notice of party name correction stating that the correct party name is "Daniel Sorrells." Dkt. # 40.

# I.

Dr. Wittenberg is a medical practitioner in Rogers County, Oklahoma. Dkt. # 1, at 1. Defendant Oklahoma Health Care Authority (OHCA) is the agency responsible for administering Oklahoma's Medicaid program and ensuring compliance with federal and state laws and regulations. Id. at 2. According to the complaint, OHCA contracted with Dr. Wittenberg to provide medical services to children covered by Medicaid. Id. at 4. Medicaid is a cooperative program between the federal government and the states that is designed to afford medical assistance to persons whose income and resources are insufficient to meet the financial demands of necessary care and services. Houghton ex rel. Houghton v. Reinertson, 382 F.3d 1162, 1164 (10th Cir. 2004). Although participation in the program is not mandatory, once a state elects to participate, it must do so on the terms established by Congress. Id. Participating states must guarantee the performance of quality control functions. Dr. Wittenberg alleges that APS has a contract with OHCA "for services pertinent to Medicaid," and that it is "contracted to be an entity which sets forth and carries out the grievance and appeals procedure pertinent to physicians receiving Medicaid payments for services rendered in treating patients, and . . . to provide peer review for said physicians." Dkt. # 1, at 3. He states that Coniglione is the retrospective review coordinator for APS, and Sorrells is the executive director of APS. Id.

Plaintiff alleges that on March 15, 2007, APS sent him a letter requesting medical records for five patients. He complied, and says that he was notified by a letter from Coniglione on May 30, 2007 that APS "took issue with certain of the patients' records it had reviewed." Id. Coniglione allegedly stated that OHCA had requested that APS review records of patients under Dr. Wittenberg's care, and that on review of the records APS had found a number of issues that required

clarification.[2]  Dr. Wittenberg says he was asked to respond to the May 30, 2007 letter within thirty days of receipt.  Id. at 5.  He responded to the APS inquiry in two separate letters, each dated June 28, 2007.  In one, he addressed treatment procedures and antibiotic issues, and in the other he addressed the chart concerns.  Id.

Dr. Wittenberg says that he received another letter from Coniglione dated August 23, 2007. The letter allegedly detailed both prior and new concerns on the part of APS, including illegible handwriting, lack of notations, failure to describe insect bites, excessive use of antibiotics, and failure to include notes from consultants in a chart.  Id.  Plaintiff claims that the letter further stated that because of "multiple instances of major deviation from safe and appropriate care," the charts had been collectively assigned a "Severity Level 3,"[3] and that APS was obligated to present its finding to the APS Medical Education and Intervention Committee (MEIC), which was scheduled to meet August 30, 2007.  Id. at 5-6.  The letter allegedly invited Dr. Wittenberg to join the meeting by phone and stated that, at the end of the meeting, the MEIC would make a recommendation regarding the records.  Dr. Wittenberg claims that upon inquiry from his staff, APS confirmed that minutes of the meeting would be kept and provided to him after the meeting.  Id.  Dr. Wittenberg says that he called in to the meeting on August 30, 2007.  At its conclusion, he was told by MEIC that it would discuss the matter further in private and inform him of its findings.

---

[2]    The requested clarifications related to illegible handwriting, failure to state treatment or immunization summary, possibly improper prescriptions of antibiotics, lack of identifying charts, and unnecessary monthly visits by a patient.  Dkt. # 1, at 4-5.

[3]    "Severity Level 3" was defined as "Gross and Flagrant: A violation of an obligation has occurred in one or more instances which presents an imminent danger to the health, safety or well-being of a program patient or places the program patient unnecessarily in high-risk situations."  Dkt. # 1, at 5-6.

On September 4, 2007, Coniglione allegedly informed Dr. Wittenberg by letter that the MEIC members had unanimously decided that deficiencies in Dr. Wittenberg's charts and practice warranted recommendation of a corrective action plan (CAP). Dr. Wittenberg says he was given a certain number of days to sign the plan, and told that if he did not sign the plan, APS would be obligated to report that fact to OHCA with a recommendation for administrative action.

Following receipt of the September 4 letter, Dr. Wittenberg claims that he asked Oklahoma state senator Sean Burrage to inquire into the process by which he was being investigated. He says that Senator Burrage received a letter dated September 28, 2007 from defendant Nico Gomez, the OHCA Director of Communication Services. Id. at 7. In it, he says that Gomez explained that OHCA employs a peer review process performed by board-certified, actively practicing physicians in Oklahoma. Id. According to Gomez, a physician subject to peer review is first interviewed and then given a written response. If concerns on the part of the reviewers remain after the interview, and the physician disputes those concerns, another independent physician reviews the charts and concerns raised by the initial review, along with any additional information provided by the physician. Id. A letter either upholding or reversing the findings of the initial review is then sent to the physician being investigated. If the findings by the second reviewer are considered substantial or serious, the case is referred to the MEIC, a body made up of three to four physicians. At that point, the physician under review is again offered the opportunity to respond by attending the conference in person or by phone. At the end of the MEIC meeting, the committee may uphold, modify, or reverse the previous decision. Id. Gomez stated that the peer review process was federally mandated, and performed by a nationally certified Peer Review Organization contracted with, but independent of, the Medicaid program. Id. at 7-8.

Dr. Wittenberg claims that his attempts to get documentation of the appeals process from APS and OHCA have been unsuccessful. He further states that he attended a MEIC meeting in Oklahoma City, Oklahoma in December 2007, but that no record of the meeting was kept, and that he was not provided a "meaningful opportunity" to put on testimony or to present evidence.[4] Id. at 8. By letter dated January 8, 2008, APS allegedly proposed another CAP. Id. at 9. APS evidently reported its findings to OHCA, because the complaint states that on March 13, 2008, OHCA sent Dr. Wittenberg a letter informing him that if he did not sign the CAP, his contract would be terminated. Dr. Wittenberg claims that he responded by stating that he could not sign the CAP as written, and that he requested a conference to explain his reservations. Defendant Lynn Mitchell, the state Medicaid director, wrote a letter in response that stated he was aware of Dr. Wittenberg's reasons for not signing the CAP as written, and that Dr. Wittenberg's response would be treated as a request for reconsideration. Mitchell further stated that the failure to sign the CAP was considered a contract violation by OHCA, and that Dr. Wittenberg's contract would therefore be terminated for cause as of April 15, 2008.[5] Mitchell informed Dr. Wittenberg that he had the right to a post-termination hearing. Id.

On April 17, 2008, OHCA extended Dr. Wittenberg's contract to April 30, 2008 after determining that numerous patients would be otherwise left without a doctor. Id. at 10. That same

---

[4]     As an example, Dr. Wittenberg cites his response to a criticism levied by APS regarding his use of an oral polio vaccine. He states that he told the MEIC that he had used that particular vaccine on the date in question because it was the only type available, and that Coniglione responded that although he knew it was the only vaccine available at that time, he thought it was a good comment, and did nothing to dismiss that complaint.

[5]     Plaintiff's complaint states that his contract would be terminated as of April 15, 2010. Dkt. # 1, at 9. The correct date appears to be April 15, 2008.

day, Dr. Wittenberg requested by letter a post-termination hearing, and made open records requests to OHCA pursuant to OKLA. STAT. tit. 51, § 24A.1.[6]  On September 16, 2008, Dr. Wittenberg was given a post-termination hearing by an OHCA panel, and he was notified of the panel's finding by letter dated September 29, 2008.  The letter stated that the panel had disregarded the APS audit and findings, but that based on the medical records, evidence, and testimony presented by Dr. Wittenberg, the panel found that there were opportunities for improvement in his practice.  The panel further found that a CAP would assist Dr. Wittenberg in improving his medical practice.  He was therefore given until October 6, 2008 to sign and return to OHCA the revised CAP, and told that if he did so, his contract would be reinstated as of the date it was signed.  Id. at 10-11.

On April 15, 2010, Dr. Wittenberg filed a complaint against OHCA, APS, and several employees of each entity.  Dkt. # 1.  He alleges that OHCA had no right to terminate his contract, that delegation of the review process to APS was improper, and that his rights were violated by the review process.  He also alleges claims for relief against the APS Defendants based on the conduct of the administrative review process for due process violations under 42 U.S.C. § 1983 and for tortious interference with his contract with OHCA.  He seeks damages, costs, attorneys' fees, and punitive damages.

The APS Defendants filed a motion to dismiss Dr. Wittenberg's claims against them on the following grounds: 1) that they are entitled to absolute immunity from suit due to their quasi-judicial functions; 2) that they are entitled to statutory qualified immunity under 42 U.S.C. § 1320c-6(b); 3) that they are not state actors, and Dr. Wittenberg was not deprived of any protected interest, for

---

[6]     Dr. Wittenberg states that OHCA has failed to respond to the records requests.  Dkt. # 1, at 10.

purposes of his due process claim under § 1983; and 4) that Dr. Wittenberg has not alleged facts showing the requisite conduct for his tortious interference claim.  Dkt. # 17.

**II.**

The motion to dismiss is made pursuant to Fed. R. Civ. P. 12(b)(6).  The APS Defendants' motion did not contain materials outside the pleadings.  However, Dr. Wittenberg attached to his response in opposition to the motion the following exhibits:  an excerpt from OHCA's "provider billing and procedure manual," Dkt. # 46, at 29; two excerpts from the Oklahoma Administrative Code, id. at 35-36; a copy of the letter sent from Gomez to Senator Burrage, id. at 37; a letter from Sorrells regarding provision of information to Dr. Wittenberg, id. at 40; and an excerpt from the contract bid submitted by APS to OHCA, id. at 41-42.  The APS Defendants attached two unpublished court orders as exhibits to their reply.  Dkt. ## 47-1, 47-2.

When "matters outside the pleadings are presented to and not excluded by the court [in deciding a motion under Rule 12(b)(6)], the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  However, "the conversion process and notice requirement are not triggered by the mere presence of outside materials, but by the court's <u>reliance</u> on such materials which are inapposite to a proper Rule 12(b)(6) disposition."  <u>Christensen v. Big Horn Cnty. Bd. of Cnty. Comm'rs</u>, 374 F. App'x 821, 826 (10th Cir. 2010)(unpublished)[7](emphasis in original).  An exception also exists to the general rule prohibiting outside materials on a motion to dismiss that allows a trial court to "take judicial notice of its own files and records, as well as facts which are a matter of public record" where they are considered only "to show their contents, not to

---

[7]  Unpublished decisions are not precedential, but may be cited for their persuasive value.  <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

prove the truth of matters asserted therein." Tal v. Hogan, 453 F.3d 1244, at 1264 n.24 (10th Cir. 2006).

The Court treats the APS Defendants' motion as one to dismiss under Rule 12(b)(6). Accordingly, it will consider only those exhibits attached to the pleadings that are a matter of the public record, to be considered only to show their contents. Those exhibits include the descriptions of the quality assurance plan from the OHCA's website (Dkt. # 46, at 29), copies of Oklahoma statutory provisions (Dkt. # 46, at 35, 36), and court orders from the Western District of Oklahoma (Dkt. ## 47-1, 47-2). The Court will disregard all other attached exhibits.

In considering a motion under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted. A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007). A complaint must contain enough "facts to state a claim to relief that is plausible on its face" and the factual allegations "must be enough to raise a right to relief above the speculative level." Id. (internal citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 562. Although decided within an antitrust context, Twombly "expounded the pleadings standard for all civil actions." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009). For the purpose of making the dismissal determination, a court must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to claimant. Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true

those allegations that are conclusory in nature. Erikson v. Pawnee Cnty. Bd. Of Cnty. Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.3d 1106, 1109-10 (10th Cir. 1991).

### III.

Dr. Wittenberg alleges claims for relief against the APS Defendants for violation of his due process rights under § 1983 and for tortious interference with contract. The APS Defendants claim that plaintiff's claims against them must be dismissed because they are entitled to absolute immunity regarding their participation in the review process. Absolute immunity may be raised as an affirmative defense in a Rule 12(b)(6) motion "if the allegations of the complaint disclose activities protected by absolute immunity." Guiden v. Morrow, 92 F. App'x 663, 666 (10th Cir. 2000)(unpublished)[8](citing Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999)). Because the allegations in the complaint include the activities upon which the APS Defendants base their claim of immunity, they are allowed to assert that defense at this time.

Absolute immunity bars all suits for money damages, including both constitutional and common law tort claims, against those entitled to its protections. See Andrews v. Heaton, 483 F.3d 1070, 1076 (10th Cir. 2007); Valdez v. City & Cnty. of Denver, 878 F.2d 1285, 1287 (10th Cir. 1989); see also Chastain v. Sundquist, 833 F.2d 311, 330 (D.C. Cir. 1987)(Mikva, J., concurring)("The [Supreme] Court has held that certain kinds of functions are so 'sensitive,' so necessary to the public good and so likely to provoke retaliatory litigation-that when an official

---

[8]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

performs them, he receives absolute immunity from civil damage suits, regardless of whether these suits charge a constitutional, statutory, or common law violation.")(internal citations omitted)(emphasis in original). "The Supreme Court has recognized the defense of absolute immunity . . . in several well-established contexts involving the judicial process." Stein v. Disciplinary Bd. of Supreme Court of New Mex., 520 F.3d 1183, 1189 (10th Cir. 2008). "Absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." P.J. ex rel Jensen v. Wagner, 603 F.3d 1182, 1195 (10th Cir. 2010). The party asserting absolute immunity must demonstrate clear entitlement. Anthony v. Baker, 955 F.2d 1395, 1399 (10th Cir. 1992).

"Typically, judges, prosecutors, and witnesses enjoy absolute immunity." Stein, 520 F.3d at 1189. In Stein, the Tenth Circuit Court of Appeals explained that "[t]he rationale for [the defense of absolute immunity] is to incorporate traditional common law immunities and to allow functionaries in the judicial system the latitude to perform their tasks absent the threat of retaliatory . . . litigation." Id. at 1189-90. There are no categorical designations of immunity. Instead, the Tenth Circuit Court of Appeals has dictated a "functional approach to claims of absolute immunity," whereby courts are to "examine whether the particular actions of the defendant are within the scope of the claimed immunity, not whether the status of the defendant or the office that [it] holds entitles [it] to protection." Jensen, 603 F.3d at 1195. Thus, defendants are entitled to absolute immunity where their duties have "an integral relationship with the judicial process." Whitesel v. Sengenberger, 222 F.3d 861, 867 (10th Cir. 2000). The following factors are relevant in assessing whether a defendant's actions are sufficiently judicial in nature to deserve the protections of absolute immunity: (a) the need to assure that the individual can perform his functions without harassment

or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctibility of error on appeal.  Moore v. Gunnison Valley Hosp., 310 F.3d 1315, 1317 (10th Cir. 2002)(citing Cleavinger v. Saxner, 474 U.S. 193, 202 (1985)).  Courts may also look to the availability of immunity at common law.  Baker, 955 F.2d at 1398.

As noted, immunity attaches to functions, not to categories of actors.  Thus, where a defendant performs mixed functions, immunity may be applicable only to some of its actions.  E.g., Stein, 520 F.3d at 1190.  Although quasi-judicial or prosecutorial functions are protected by absolute immunity, investigative or administrative functions receive only qualified immunity.  Id. at 1190, 1193; see also Becker v. Kroll, 494 F.3d 904, 925 (10th Cir. 2007).  The decision whether to bring charges, along with the review of evidence that such a decision requires, "is a quintessential prosecutorial function protected by absolute immunity."  Id. at 1194.

The APS Defendants argue that APS's status as a peer review organization within the Medicaid system entitles it to absolute immunity from suit.  Dkt. # 17, at 12-15.  Their argument relies heavily on Kwoun v. Southeast Missouri Professional Standards Review Organization, 811 F.2d 401 (8th Cir. 1987).  The APS Defendants argue that in Kwoun and other cases, "federal circuit courts have held the same utilization and quality control peer review functions the APS Defendants performed [to be] entitled to absolute immunity from constitutional liability in light of the governmental/prosecutorial role such activities entail."  Id. at 13.  They also argue that the Tenth Circuit's decision in Moore provides implicit support for their immunity from suit.  Id. at 14-15. However, the status of APS alone will not trigger immunity.  Instead, the Court must look to the

rules governing and the functions performed by APS to determine whether its activities should be deemed quasi-judicial or prosecutorial and therefore deserving of immunity.

**A.**

Dr. Wittenberg alleges that APS is "an entity which sets forth and carries out the grievance and appeals procedure pertinent to physicians receiving Medicaid payments for services rendered in treating patients," and provides "peer review for said physicians." Dkt. # 1, at 3. He also claims that OHCA has stated that the peer review process is federally mandated and performed by a "nationally certified Peer Review Organization contracted with, but independent of, Medicaid or Medicare." Id. at 7-8. Finally, he states that "[i]t appears on information and belief that OHCA contracts with APS to provide the administrative grievance procedure for physicians who are compensated for services under Oklahoma's Medicaid system, and in addition contracts with APS to provide for the peer review process." Id. at 11. Based on these allegations, APS is an organization that has a contract with the state to provide the quality control functions mandated by the federal government for states participating in the Medicaid program. Although such organizations were previously known as "peer review organizations," as Dr. Wittenberg refers to them in his complaint, they are now called "quality improvement organizations" (QIOs). See generally 67 Fed. Reg. 36539-01. The definition and function of the organizations is the same. Id.

As stated, Medicaid involves a federal-state partnership implemented through individual state plans for care. The Medicaid Act imposes controls on payments made to states under the Medicaid program. To be approved as part of the Medicaid program, state plans must provide quality controls to ensure against unnecessary utilization of services and assure that payments are "consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). To satisfy

those requirements, a state may contract with a QIO or a QIO-Like Entity,[9] private organizations trained to review and help with complaints about medical care. 42 U.S.C. §§ 1320c-7(a); 1396a(d). The contract with a QIO or QIO-Like Entity must provide "for the performance of activities not inconsistent" with the requirements of 42 U.S.C. § 1320c. 42 U.S.C. § 1396a(d). The review organization must be composed of or have available to it a substantial number of doctors representative of practitioners in the area. 42 U.S.C. § 1320c-1(1). Moreover, a state Medicaid program is "considered incapable of performing utilization and quality review functions in an effective manner, unless the [s]tate demonstrates to the satisfaction of [the Center for Medicare & Medicaid Services] that it will act with complete independence and objectivity." 42 C.F.R. § 475.104.

One of the primary functions of QIO-Like Entities is to review the professional activities of physicians and health care practitioners. 42 U.S.C. § 1320c-3(a)(1)(B). More specifically, QIO-Like Entities review practitioners' activities to ensure they are meeting their obligations to provide service that is: 1) economically and medically necessary; 2) of a quality that meets professionally recognized standards of health care; and 3) supported by evidence of medical necessity and quality. 42 U.S.C. § 1320c-5(a). If a QIO-Like Entity discovers a perceived compliance issue during its

_____

[9]     As part of the Medicare program, the Secretary of Health and Human Services enters into a contract with one QIO for each state. 42 U.S.C. § 1320c-2. In the Medicaid program, quality control functions may also be performed for states by organizations that do not have a Medicare contract with the Secretary but which nonetheless meet the requirements of a "utilization and quality control peer review organization" of 42 U.S.C. § 1320c-1. 42 U.S.C. § 1396a(d). The APS Defendants claim that APS is properly deemed a "QIO-Like Entity," and Dr. Wittenberg has not alleged any facts that suggest APS is the sole contractor for Oklahoma's Medicare program. Thus, the QIO-Like Entity designation appears appropriate, and the Court will refer to it as such. However, the designation of APS as a QIO versus a QIO-Like Entity has no impact on the outcome of this decision.

review, it is required to provide the practitioner with reasonable notice and opportunity for discussion, and, where appropriate, a reasonable opportunity to enter into a CAP, prior to reporting compliance issues to the state. 42 U.S.C. § 1320c-5(b)(1). After such notification, where the QIO-Like Entity determines that a practitioner has "failed in a substantial number of cases substantially to comply" with or has "grossly and flagrantly violated" its obligations, the QIO-Like Entity "shall submit a report and recommendations" to the contracting agency. Id.

Any practitioner dissatisfied with a determination made by a QIO-Like Entity is entitled to reconsideration of the determination by the reviewing organization. 42 U.S.C. § 1320c-4. Upon request, the QIO-Like Entity must provide an opportunity for examination of the material upon which its initial determination was made, and must provide a party with the opportunity to submit new evidence before the reconsidered determination is made. 42 C.F.R. §§ 478.24(a), 478.24(c). The reconsideration must be completed by an individual other than the one who made the initial denial determination, and may be based on the information that led to the initial determination, new information found in medical records, or additional information submitted by a party. 42 C.F.R. §§ 478.28, 478.30. Written notice of the reconsidered determination must be provided to the practitioner for whom the reconsideration was performed, and a record of the reconsideration must be maintained by the QIO-Like Entity. 42 C.F.R. §§ 478.34, 478.36. The reconsideration determination is binding upon all parties; practitioners dissatisfied with the reconsideration do not have the right to a further hearing. 42 C.F.R. §§ 478.38, 478.40.

The Oklahoma Administrative Code states that

the process afforded providers by [OHCA's QIO] is the only administrative remedy available to providers. The decision issued by the QIO is considered by the OHCA to be a final administrative determination. The final QIO determination is not appealable to the OHCA for any further administrative hearings.

14

Okla. Admin. Code 317:2-1-9. The APS Defendants argue that this provision applies "only in the context of utilization reviews," not to peer review activities.[10] Dkt. # 47, at 6. However, such an interpretation is unsupported by the plain language of the provision, and the APS Defendants have not provided any argument in support of that claim. Therefore, it appears that determinations by a QIO-Like Entity are considered to be final by OHCA. A separate appeal process to OHCA applies to providers who have had their Medicaid contracts suspended or terminated by the OHCA for cause. Okla. Admin. Code 317:2-1-12. This appeal process mirrors the federal review system established for determinations based on recommendations from QIOs in 42 U.S.C. § 1320c-5(b)(4).

**B.**

Few courts have considered the question of immunities applicable to QIO-Like Entities under contract with a state Medicaid program. The most prominent case on the subject is <u>Kwoun</u>, in which the Eighth Circuit upheld a grant of absolute immunity to members of a state QIO in the context of the Medicare program. The plaintiff in <u>Kwoun</u> was a doctor who was excluded from eligibility for Medicare payments by the Health Care Financing Administration (HCFA) following investigations by both state and regional peer review groups. 811 F.2d at 402-04. The doctor filed suit against, among others, the peer review groups, claiming that they had deprived him of his right to make and enforce contracts and of equal protection of the law. <u>Id.</u> at 403. He also alleged claims for relief against them based on malicious prosecution and extreme and outrageous conduct. <u>Id.</u>

---

[10]    The APS Defendants also make much of the fact that the title of the provision in effect during 2007-2008 was "OHCA's Designated Agent's appeal process for Behavioral Health services," a category of services that does not encompass pediatricians like Dr. Wittenberg. Dkt. # 47, at 6 n.2. However, because the contents of the rule remained the same when the title of the rule was later changed to "OHCA's Designated Agent's appeal process for QIO Decisions," the more logical explanation is that the title was changed to reflect the broader intended application of the rule.

The peer review groups in <u>Kwoun</u> argued that they were entitled to absolute immunity from constitutional claims because their actions were "essentially prosecutorial in nature." <u>Id.</u> The court considered the regulations governing the composition of peer review groups, and concluded that their status as "organizations of professionals charged with the task of evaluating the performance of members of their profession" made them very similar to other disciplinary and practice committees that had been declared to be immune on the basis that the "committee's function shared the characteristics of the judicial process," "an unfavorable recommendation from [the] committee had the potential of provoking a retaliatory lawsuit," and "the subject of [the] committee's actions had adequate opportunity to challenge those actions through judicial review." <u>Id.</u> at 408-09 (citing <u>Austin Mun. Secs., Inc. v. Nat'l Ass'n of Secs. Dealers, Inc.</u>, 757 F.2d 676, 689 (5th Cir. 1985)(prosecutorial and adjudicative functions of securities dealers' association disciplinary committee entitled to absolute immunity); <u>Clulow v. Oklahoma</u>, 700 F.2d 1291, 1298 (10th Cir. 1983)(prosecutorial function of bar disciplinary committee entitled to absolute immunity); <u>Simons v. Bellinger</u>, 643 F.2d 774, 782 (D.C. Cir. 1980)(prosecutorial and adjudicative functions of bar committee entitled to absolute immunity)). Therefore, the court found that the peer review groups were also deserving of immunity. In extending immunity to the peer review groups, the court noted that it was "not unmindful of the problems that may arise" from that extension. <u>Id.</u> at 409. However, it found that the effective functioning of the Medicare program depended on some mechanism by which to control quality of care. It also found that the only way to ensure the effectiveness of that mechanism and the willingness of private doctors to participate in it was to insulate peer review groups from damages claims that may arise from the review work. <u>Id.</u>

A similar conclusion was reached in <u>Ostrzenski v. Seigel</u>, 177 F.3d 245 (4th Cir. 1999). The plaintiff in <u>Ostrzenski</u>, a doctor, sued another doctor who had conducted a peer review of the plaintiff at the request of a state medical board. The plaintiff brought his action pursuant to 42 U.S.C. § 1983, alleging violations of his federal due process rights as well as false light invasion of privacy under Maryland law. <u>Id.</u> at 247. The <u>Ostrzenski</u> court noted that "[e]very court of appeals that has addressed the issue has concluded that members of a state medical disciplinary board are entitled to absolute quasi-judicial immunity for performing judicial or prosecutorial functions," and found that the responsibilities of the peer reviewer were "analogous to those of a prosecutor reviewing the evidence to determine whether to recommend prosecution." <u>Id.</u> at 250. It stated that its finding was further supported by the need to "ensure that peer reviewers perform their functions for the public good without harassment and intimidation" and the fact that adequate procedural safeguards existed to protect against abuses by reviewers. <u>Id.</u> at 250-51.

The Tenth Circuit distinguished the outcomes of <u>Kwoun</u> and <u>Ostrzenski</u> in <u>Moore</u>. In <u>Moore</u>, the plaintiff was a physician on the staff of a public hospital. 310 F.3d at 1316. He was temporarily suspended from practice by an <u>ad hoc</u> committee composed of administrators at the hospital at which he worked. <u>Id.</u> The committee later voted to terminate the suspension, and the physician was allowed to continue in his position. However, he subsequently received two formal admonitions from the hospital regarding the alleged misconduct at issue in the suspension. <u>Id.</u> The plaintiff was not notified of the existence of the committee or the pending investigations, nor was he given an opportunity to appeal or challenge the actions before the admonitions were issued. Following issuance of the admonitions, the plaintiff brought suit against members of the review

committee for violations of his due process rights. The review committee members' argument that they were entitled to absolute immunity was rejected by the district court, and defendants appealed.

In considering the peer review committee's entitlement to absolute immunity, the Tenth Circuit followed the test established in <u>Cleavinger</u>. <u>Id.</u> at 1317. Thus, it looked to (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctibility of error on appeal. <u>Id.</u> at 1317-18. It first found that the "mere existence of [the] lawsuit" showed that there was a danger of potential harassment of members of the review committee, and that the first factor therefore favored immunity. However, the court found that the committee did not satisfy the other <u>Cleavinger</u> factors. The plaintiff was not provided procedural protections that could act as safeguards against abuse and prevent the need for private lawsuits. Further, the potential for political influence was high where members of the review committee worked in the same hospital as the plaintiff, and the committee therefore lacked the "independence typical of judicial bodies." <u>Id.</u> at 1318. The court did not find evidence that the committee was relying on precedent from either internal or external sources in conducting its review, and noted that the committee proceedings were completely lacking in adversarial nature because the plaintiff was not even given notice of the proceedings. <u>Id.</u> Finally, hospital rules precluded any form of appeal as to the letters of admonition, and the plaintiff therefore had no recourse other than a lawsuit. <u>Id.</u> at 1318-19. The state statutory scheme did not provide for oversight of the review committee by the state board, and the review committee could not be considered an extension of the state board for immunity purposes. <u>Id.</u> at 1320.

The Moore court acknowledged but distinguished the decisions in Kwoun and Ostrzenski. It noted that in Kwoun, the members of the peer review organization had no authority to impose sanctions or discipline, the organization was subject to direct supervision by a federal agency, and the procedure outlined by federal statute allowed for full administrative review. Id. Moreover, it found that in Ostrzenski, the doctor performing the review had no authority to discipline but instead could only make recommendations to the state medical board, and that the subject of review was entitled to notice and a hearing before any disciplinary action could be taken. Id. The Moore court found that the question of immunity for the hospital committee was "significantly different" than in those cases based on the lack of procedural safeguards, oversight, or rights to appeal applicable to the hospital committee, and rejected the defendants' claims of absolute immunity.

Dr. Wittenberg argues that his review by the APS Defendants has more in common with Moore than Kwoun. He states that Kwoun is distinguishable because in that case the recommendations of the peer groups were subject to review by an administrative law judge.[11] Dkt. # 46, at 11-12. He argues that he did not have similar appeal rights and that he was provided with "no procedural safeguards whatsoever," and states that on that basis Moore is "strong authority for the argument that absolute immunity does not exist under the facts at hand." Id. at 18, 20.

---

[11] He also argues that Kwoun is distinguishable because of the lack of statutory abrogation arguments in that case. Dr. Wittenberg's arguments regarding abrogation are addressed below.

**C.**

In examining the APS Defendants' entitlement to absolute immunity, the Court applies the test set out in <u>Cleavinger</u>, and will consider the factors identified in that case to assess whether the activities of the APS Defendants are "characteristic of the judicial process." <u>Id.</u> at 1317 (internal citations omitted).

**i.**

The first factor is "the need to assure that the individual can perform his functions without harassment or intimidation." <u>Id.</u> As in <u>Moore</u>, the existence of Dr. Wittenberg's lawsuit against the APS Defendants demonstrates the potential for harassment of APS based on the performance of its review functions. That factor weighs in favor of absolute immunity.

**ii.**

The second <u>Cleavinger</u> factor is "the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct." <u>Id.</u> As noted, Dr. Wittenberg has alleged that APS is an organization that implements the federally-mandated quality control process for the state Medicaid program. Such organizations, QIO-Like Entities, are governed by statutes that include a variety of procedural controls. Although the statute does not set out specific evidentiary or hearing requirements for initial review of a practitioner, it does contemplate involvement by the practitioner at later stages. When a QIO-Like Entity discovers perceived compliance issues during a review, it must provide reasonable notice and opportunity for discussion prior to reporting compliance issues to the state. 42 U.S.C. § 1320c-5(b)(1). Practitioners dissatisfied with an initial determination by the QIO-Like Entity are entitled to reconsideration, and must be given the materials upon which the initial determination was made as well as an opportunity

to submit new evidence. 42 U.S.C. § 1320c-4; 42 C.F.R. §§ 478.24(a), 478.24(c). A QIO-Like Entity does not have the authority to impose any kind of sanctions or discipline, but instead makes recommendations to the contracting agency regarding its findings. In Oklahoma, decisions issued by a QIO are considered final by OHCA for purposes of their decisionmaking process, but providers who have had their Medicaid contracts suspended or terminated by the OHCA for cause are entitled to a separate appeal process. Okla. Admin. Code §§ 317:2-1-9, 317:2-1-12.

Several procedural safeguards contained in the Administrative Procedure Act (APA) are not incorporated into the regulations governing QIO review. For instance, practitioners are not afforded a lawyer or another representative, there is no right to be present for the initial review or reconsideration, those under review do not have the right to compel the attendance of witnesses or to discovery, there is no cognizable burden of proof, and there is no indication that the federal rules of evidence apply. See Cleavinger, 474 U.S. at 207. Further, there is no right to a hearing for practitioners before an administrative law judge. However, other aspects, such as the right to notice prior to any report to the contracting agency, the right to reconsideration, the opportunity to provide new evidence, and the requirement that the QIO-Like Entity retain a record of all proceedings and make them available to the practitioner, more closely approximate protections outlined in the APA. Further, although OHCA considers findings by a QIO to be final, it retains ultimate control over practitioners' contracts, and a separate appeal process exists if a practitioner is terminated.

Dr. Wittenberg alleges that he was provided "no procedural safeguards whatsoever." Dkt. # 46, at 20. But even construing his allegations in the light most favorable to him, that statement is belied by the allegations in his complaint. His complaint states that he was given notice of the results of APS's initial review and an opportunity to respond and provide additional information.

Dkt. # 1, at 4-5. He was told of APS's continued concerns, and of the subsequent presentation of his case to the MEIC. Id. at 6. Further, his allegations demonstrate a level of review even beyond that required by statute in the form of second-level review by the MEIC. He was given the opportunity to join the two MEIC discussions, and was informed of the MEIC's decision before it reported to OHCA. Id. at 6-9. Moreover, although APS recommended a CAP for Dr. Wittenberg, he does not allege that it did impose or could have imposed any other kind of discipline on him. Instead, he states that APS told him only that it was obligated to report its findings to OHCA, and that it could make a recommendation for administrative action. Id. at 7. All of plaintiff's allegations regarding the decision to terminate his contract, including the post-termination hearing that he received, relate to OHCA, not APS. Id. at 9-11. Dr. Wittenberg alleges that no records were kept during the review process, and the Court accepts that allegation as true. However, it cannot accept Dr. Wittenberg's conclusory statements that he received no protections, that the review he received was nothing but a "sham," and that his opportunity to participate in his review was "not meaningful." Id. at 8, 14.

The types of procedural safeguards that Dr. Wittenberg received reduce the need for private lawsuits, as practitioners have the opportunity to oppose decisions made by APS other than by filing suit. They are also far beyond what was provided in Moore, where the plaintiff had no notice of or opportunity to participate in his review. Instead, the safeguards that Dr. Wittenberg received more closely approximate those in Kwoun and Ostrzenski, where the Tenth Circuit found that the "significant procedural safeguards" in place supported a grant of immunity.

**iii.**

Next, the Court must consider the APS Defendants' insulation from political influence. Although Dr. Wittenberg takes issue with much of the review process, he has not alleged impropriety based on political influence. The provisions governing QIOs require that those organizations be composed of a large number of the practicing physicians in any given area. 42 U.S.C. § 1320c-1(1). That requirement makes APS readily distinguishable from the committee in Moore, where the committee members worked in the same hospital as the plaintiff. The pool from which APS draws for review functions is much larger than a single place of employment, and does not pose the same risks of subjectivity in review. Further, OHCA has an obligation to show that APS will "act with complete independence and objectivity." 42 C.F.R. § 475.104.

The review process undertaken by APS is mandated and controlled by the Medicaid program, which dictates the goals and scope of that process. Thus, it is the Medicaid system and its established standards of care that dictate who is subjected to review and the parameters by which that review is conducted. Although OHCA may make referrals for investigation to APS and retains ultimate control over its contracts with APS, the physician reviewers are not employed by or subordinate to OHCA. This functional independence is distinct from Cleavinger, where the Supreme Court decided that a prison disciplinary board was entitled only to qualified immunity based in part on the fact that members of the board were directly subordinate to the wardens who reviewed their decisions, and that they worked with the employees who brought the charges heard before the board. 474 U.S. at 203-04. Based on the governing regulations and the lack of any allegations suggesting improper influence, political influence on APS does not appear to be a significant concern.

**iv.**

A body's reliance on precedent in resolving controversies is another factor that supports entitlement to absolute immunity, as that reliance serves as one "of the many checks on malicious actions by judges." Butz v. Economou, 438 U.S. 478, 512 (1978). Neither party has made any arguments regarding the APS Defendants' reliance on precedent, either in terms of its own internal decisions or external decisions by other QIOs, and requirements regarding precedent do not appear in the regulations governing QIOs. "In the absence of such internal and external precedent, this factor adds little to the analysis." Moore, 310 F.3d at 1318.

**v.**

The Court must also consider the adversary nature of the review process. Under the regulations, practitioners are not required to receive notice prior to initial review by a QIO-Like Entity. However, they must be notified of the reviewer's initial determination, and must be given reasonable notice and an opportunity for discussion prior to reporting by the QIO-Like Entity to the contracting agency. Further, practitioners are entitled to reconsideration of the initial determination, as well as the opportunity to present evidence. The opportunity for comment, to request reconsideration, and to present evidence introduces characteristics of the adversary system into the QIO review. According to the allegations in the complaint, Dr. Wittenberg participated in the review process by commenting and providing more information in response to a letter from APS detailing its initial concerns in the review. He also asked for a reconsideration of APS's initial determination, and later exercised his right to participate in several MEIC meetings. Dkt. # 1, at 7-9. Further, he requested and received a post-termination hearing from OHCA. It therefore appears that he had the opportunity to participate in the proceedings and present evidence in support of his

interests. That ability is an important factor in assessing the adversarial nature of an entity's activities.

## vi.

The final factor in the immunity analysis is the correctibility of error on appeal. As stated, within the review structure for QIO-Like Entities, practitioners dissatisfied with an initial determination are entitled to reconsideration by another reviewer. Dr. Wittenberg's allegations state that he received not only a reconsideration of the original determination, for which he supplied additional information, but also two reviews by the MEIC, which he attended either in person or by phone. Moreover, while the availability of review as to a QIO decision ends after reconsideration, OHCA provides practitioners whose contracts have been terminated with the right to appeal, and Dr. Wittenberg was given a post-termination hearing.

These avenues of appeal provide several opportunities for the correction of error on review. Indeed, the process required for QIO-Like Entities and that was executed by APS is nearly identical to that in Kwoun, which the Tenth Circuit characterized as "full administrative review." Moore, 310 F.3d at 1320.[12] Such review mechanisms provide practitioners with a means by which to assert claims of error, and lessen the need for lawsuits to perform that function.

---

[12]    Dr. Wittenberg alleges that, in Kwoun, the plaintiff was entitled to review by an administrative law judge. Dkt. # 46, at 11. Review by the administrative law judge in Kwoun was available regarding the decision by HCFA, the federal agency with which the plaintiff had a contract to provide Medicare services, to terminate his contract. 811 F.2d at 404. This post-termination review is similar to that provided Dr. Wittenberg by OHCA. The difference between the two procedures lies in the distinction between the structure of the Medicare and Medicaid programs.

The review process engaged in by APS endows it with significant characteristics of a body within the judicial system, and entitles it and its employees to absolute immunity. APS's functions are controlled by federal statute, and that statute sets out clear requirements for the composition of potential reviewers, the scope of review, and available procedural protections. During the APS review process, participating doctors review the medical practices of practitioners within the state Medicaid system and decide, among other things, whether those practices are in compliance with generally acceptable standards of care. Practitioners under review are entitled to reconsideration before a different reviewer, who must accept new information supplied by the practitioner before rendering a final recommendation. Dr. Wittenberg alleges that APS provides an additional level of review in the form of the MEIC. Moreover, APS is responsible only for making recommendations, not for imposing discipline. Without the protections of immunity, the likelihood of harassment of doctors who perform review functions is high, as demonstrated by the current lawsuit. Based on all of these factors, the review process conducted by the APS defendants is sufficiently analogous to judicial processes to justify a grant of absolute immunity for its review functions.

The grant of such immunity is not made lightly, as the Court acknowledges the problems that may arise when shielding a category of persons from all claims for damages. However, absolute immunity is "essential to protect the integrity" of both the judicial process and those who "perform functions closely associated with the judicial process." Cleavinger, 474 U.S. at 200. And immunity status is for the benefit of the public as well as for the individual concerned. Id. For the federal-state Medicaid partnership to remain functional, there must be a mechanism by which to ensure quality of care. The Court shares the opinion expressed in Kwoun that quality controls increase the

benefits of the program both for participating states and for individuals receiving care, and that the use of private doctors to review medical decisions is undoubtedly more efficient and effective than the use of agency officials less familiar with medical practices and analyses. 811 F.2d at 409. Without the protections of immunity, many doctors might be unwilling to participate in the review process due to fear of damages claims. Thus, the Court is convinced that "absolute immunity is essential for the conduct of the public business in this critical health care area." Id. The procedural protections applicable throughout the review process guard against mistakes and abuse of power, and ensure that practitioners subject to review are not denied their fundamental rights. A grant of absolute immunity from suit for damages is therefore warranted.

## D.

The grant of absolute immunity for participants in APS's review functions extends no further than necessary to protect the public policy interests that justify its application. Spielman v. Hildebrand, 873 F.2d 1377, 1382 (10th Cir. 1989). Dr. Wittenberg's complaint states that "the APS Defendants were responsible for providing for the grievance and appeals process," and that they were in "direct and indirect control and were responsible for the policies, customs and practices complained of herein." Dkt. # 1, at 14. He further states that his claims for relief against the APS Defendants are based on insufficiencies in the review process and the illegitimacy of APS adopting those functions. Those claims regarding the nature and content of the review process address functions within APS's quasi-judicial role only. Plaintiff has not made allegations regarding administrative or other functions by APS that fall outside its quasi-prosecutorial and judicial functions. Therefore, the APS Defendants are entitled to absolute immunity for the entirety of plaintiff's claims against them.

**III.**

Wittenberg argues that even if the APS Defendants would be otherwise entitled to absolute immunity, Congress abrogated any such immunity in 42 U.S.C. § 1320c-6(b),[13] which states that:

> No organization having a contract with the Secretary under this part and no person who is employed by . . . any such organization or who furnishes professional services to such organization, shall be held by reason of the performance of any duty, function, or activity required or authorized pursuant to this part or to a valid contract entered into under this part, to . . . be civilly liable under any law of the United States or of any State . . . provided due care was exercised in the performance of such duty, function, or activity.

The Tenth Circuit has not addressed the proper interpretation of § 1320c-6(b). However, in other contexts, it has required a showing that "Congress, in clear and unmistakable terms, intended to abrogate" an otherwise applicable immunity. See Ellis v. Univ. of Kan. Med. Center, 163 F.3d 1186, 1196 (10th Cir. 1998).

The question of abrogation via § 1320c-6 was addressed in Kwoun, where a dissenting judge opined that peer review groups were entitled only to qualified immunity because the limitation on liability in 42 U.S.C. § 1320c-6 abrogated the availability of absolute immunity. Id. at 411-13. The majority rejected that view, noting that although legislative history regarding the statute was sparse, the limited information available suggested that § 1320c-6 was enacted to extend protection to peer review groups. Id. at 409 n.13. The court concluded that the liability provision had been enacted

---

[13]     Dr. Wittenberg suggests that 42 U.C.C. § 1320c-6(a) may also be applicable to the APS Defendants. Even assuming that section to be applicable in some way to APS, Dr. Wittenberg has not presented evidence that Congress intended it to abrogate common law immunities. Therefore, his argument regarding § 1320c-6(a) is rejected for the same reasons as his § 1320c-6(b) argument.

prior to a string of decisions from federal courts that consultants to government agencies could be federal actors for immunity purposes. In that context, the court read the liability provision as an "effort to <u>extend</u> some protection to people who were thought to have none, rather than an attempt to <u>restrict</u> protection already acknowledged to exist." <u>Id.</u> (emphasis in original). The court acknowledged that the limitation is now superfluous in nearly all cases, but found that it did not bar extension of absolute immunity to the peer review groups. <u>Id.</u> The Seventh Circuit adopted the <u>Kwoun</u> court's reasoning on the abrogation issue in <u>Wood v. Freeman</u>, No. 89-3685, 1991 WL 222150 (7th Cir. Oct. 25, 1991), noting that it could "find no evidence that Congress intended to abrogate the common law immunities available to the [peer review groups] and their physician members when they engage in quasi-prosecutorial functions, and refuse[d] to create any such intent when Congress [was] silent." <u>Id.</u> at * 2. That holding was similarly accompanied by a dissenting opinion that echoed the one in <u>Kwoun</u>. <u>Id.</u>

Like the courts of appeals that have addressed this issue, this Court has found no evidence that supports a finding that Congress intended in § 1320c-6(b) to abrogate the common law absolute immunity otherwise available to QIO-Like Entities. Barring such "clear and unmistakable" evidence, the requisite showing for abrogation cannot be made. <u>See</u> <u>Ellis</u>, 163 F.3d at 1196. Thus, § 1320c-6(b) does not interfere with the Court's finding that the APS Defendants were entitled to absolute immunity in the execution of their quasi-adjudicatory functions.

Because the Court finds that plaintiff's claims against the APS Defendants for their quasi-judicial functions are uniformly barred on absolute immunity grounds, it does not address the

defenses of statutory immunity, lack of state action,[14] or failure to state a claim as to due process or tortious interference with contract.

**IT IS THEREFORE ORDERED** that Defendants Innovative Resource Group, LLC, Thomas Coniglione, and Richard Sorrells Motion to Dismiss and Brief in Support (Dkt. # 17) is **granted**, and those parties are terminated as defendants in this matter.

**IT IS FURTHER ORDERED** that plaintiff's request for discovery is **denied**.

**IT IS FURTHER ORDERED** that plaintiff's request for hearing on the motion to dismiss (Dkt. # 49) is **moot**.

**DATED** this 16th day of March, 2011.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[14]   Liability under 42 U.S.C. § 1983 attaches "only to conduct occurring under color of state law"; the statute "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." Anderson v. Kitchen, 389 F. App'x 838, 840 (10th Cir. 2010)(unpublished). Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

As the APS Defendants note, other federal courts have consistently held that peer review organizations, "and hence QIOs and QIO-Like Entities," are not state actors subject to § 1983 claims. Dkt. ## 17, at 18-19; 47, at 3-4 (citing Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037 (D.C. Cir. 1987); Smith v. N. La. Med. Review Ass'n, 735 F.2d 168 (5th Cir. 1984); Taylor v. Flint Osteopathic Hosp., Inc., 561 F. Supp. 1152 (E.D. Mich. 1983); Evans v. Okla. Found. for Med. Quality, Order, No. CIV-01-557-T, W.D. Okla., July 11, 2002, at 3; Rustling Winds, Inc. v. Okla. Found. for Med. Quality, Order, No. CIV-01-252-HE, W.D. Okla. March 6, 2002, at 6)).